IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 1, 2008

## STATE OF TENNESSEE v. LEON FLANNEL

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-07354    Carolyn Wade Blackett, Judge**

---

**No. W2007-00678-CCA-R3-CD  - Filed October 13, 2008**

---

The defendant, Leon Flannel, was convicted by jury of one count of murder in perpetration of a theft and one count of premeditated murder. He was sentenced to life imprisonment for both convictions, which were merged. The defendant now appeals, arguing that: (1) the evidence was insufficient to sustain his convictions and his conviction for murder in perpetration of a theft was unconstitutional; (2) the trial court failed to properly exercise its duty as thirteenth juror; (3) the trial court erred in failing to grant the defendant's motion to suppress his statement to police; (4) the trial court erred in qualifying certain state witnesses as experts; (5) the trial court erred in admitting a letter into evidence without proof of chain of custody and proper authentication; (6) the trial court made improper comments regarding witness qualification and jury instruction; and (7) cumulative error in the trial proceedings requires relief. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which John Everett Williams and Alan E. Glenn, JJ., joined.

Phyllis Aluko (on appeal) and William E. Robilio and Kathy Kent (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Leon Flannel.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Goodman and Tracye Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### TRIAL TESTIMONY

The following relevant testimony was presented at the defendant's trial. Tammie Robinson testified that she was a close friend of the victim, David Cooper. According to Robinson, the victim was a nurse who had worked at the Penal Farm, Memphis Mental Health Institute and Spring Gate Rehabilitation Center. The victim was also homosexual and had previously met partners where he worked. She last saw the victim on May 10, 2003, the Saturday before Mother's Day. After being unable to contact the victim and finding the victim's car parked in the driveway and the doors locked at the victim's house, Robinson became worried. She eventually called police and asked them to forcibly enter the victim's home. On cross-examination, Robinson acknowledged that she was aware that the victim had intimate relationships with two men and that the victim had an argument with one of them.

Officer John Standridge of the Memphis Police Department testified that on May 12, 2003, around 3:00 a.m., he received a dispatch regarding an alarm call for the residence located at 1005 Elizabeth Lane. Upon arrival, he checked the premises for signs of a break-in. Officer Standridge recounted that the doors of the residence appeared to be locked and nothing appeared wrong, so he issued a "Metro False Alarm Notice" for David Daubert, who was listed as the owner representative for the residence. Officer Standridge stated that he could not recall whether a car was parked in the driveway or whether any lights were on in the residence.

Officer Webb Kirkdoffer of the Memphis Police Department testified that on May 15, 2003, around 4:00 p.m., he and another officer went to the victim's home located at 1005 Elizabeth Lane. Officer Kirkdoffer explained that they visited the victim's home because police had received a call to check on the victim who had not been seen for about a week. Officer Kirkdoffer stated that when he arrived, a silver SUV was parked outside the home in the driveway. The victim's neighbors informed him that the victim was usually home when the SUV was parked in the driveway. Officer Kirkdoffer recalled that he knocked on the door but received no response. After checking the house, he found the storm door was open but the inside door was locked. However, he observed no signs of break-in or damage to the house or the victim's SUV. Therefore, Officer Kirkdoffer elected not to forcibly enter the victim's home.

Donald Cooper, the victim's father, testified that he talked to the victim by phone on Mother's Day. Later that week, Mr. Cooper and his wife called the victim several times but received no response. Mr. Cooper stated that he grew concerned about the victim after learning that the victim's voice mail accounts were full. Mr. Cooper recounted that he and his wife drove from their home in Alabama to their son's home in Memphis in order to check on him and see if he was okay. Mr. Cooper noted that he used a spare key to enter his son's house. After walking through the house, he found the victim dead, lying on his bed in the bedroom. Mr. Cooper acknowledged that the victim owned a .25 caliber pistol. He further noted that he was aware of the victim's sexual orientation.

Several Memphis police officers testified regarding their role in securing the crime scene and the recovery and collection of evidence. Police Officer Anthony Rudolph testified that he was with Mr. Cooper when the victim was found. Officer Rudolph observed the victim lying on his back on

the bed with a large amount of blood around the victim's head. Officer Rudolph testified that the victim's house was neat and clean and, other than observing a gun holster and a beer bottle on the coffee table, nothing appeared amiss. Police Officer Scott Reed testified that he found no signs of forced entry into the victim's house and the house was very neat. Police Officer Mary Pickens testified that she photographed the crime scene and prepared a sketch of the bedroom. Officer Pickens noted that several .25 caliber shell casings were found under the victim and the victim's bed. A loaded gun clip containing .25 caliber bullets was found in the living room under a table. Six empty beer bottles and a cardboard beer container were also found in the victim's house.

Dr. Teresa Campbell, a forensic pathologist for the Medical Examiner's Office, testified that the victim's autopsy revealed that the victim suffered multiple gunshot wounds to his face and head, and he died as a result. According to Dr. Campbell, the presence of gunpowder stippling and soot around the victim's wounds indicated that the gun was fired no more than six inches away from the victim's face and head. Other than the gunshot wounds, the victim had no other injuries to his body. No alcohol or drugs were found in the victim's blood, though it was possible for a small amount of alcohol to dissipate from the victim's blood over time.

Paul Pickens testified that he lived in the victim's neighborhood but did not know the victim. He recounted that he found the victim's wallet on the sidewalk several streets away from the victim's house the Monday after Mother's Day. He attempted to return the wallet several times but was unable to contact the victim. Mr. Pickens recalled that the victim's wallet contained the victim's name, phone number and address, about $25 in cash, and credit cards. Mr. Pickens eventually turned the victim's wallet over to police.

Keeiyona Hill testified that she was the former girlfriend of the defendant. She recalled that the defendant and the victim met each other at a physical rehabilitation and nursing facility in Memphis and became friends. On a Monday morning in May 2003 around 2:00 a.m., the defendant called her and told her that he was at the victim's house. The defendant told her that he had gone over to the victim's house at the victim's request. The defendant indicated he was upset because he did not want to have sex with the victim and the victim should not have "put him in some type of situation." The defendant said that he played asleep while at the victim's house. When the victim fell asleep, the defendant found the victim's gun. The defendant said he wanted to kill the victim and steal his vehicle. Ms. Hill explained that she tried to calm the defendant and urged him to leave the victim's house and get a hotel room. Ms. Hill stated that she had Caller ID which identified the incoming call as coming from the victim.

Sergeant John Oliver of the Memphis Police Department testified that he participated in the investigation of the victim's homicide. After review of the phone records from the victim's cell phone, Sergeant Oliver discovered that calls had been made to a Keeiyona Hill in Marianna, Arkansas and to a Lamonte Williams and Damien Flannel in Michigan around the estimated time of the victim's homicide. After talking to these individuals, Sergeant Oliver discovered that none of these individuals knew the victim but all of these individuals knew the defendant. Sergeant Oliver then obtained an arrest warrant for the defendant. The defendant was eventually taken into custody

in Marianna, Arkansas and transported to Memphis. After the defendant arrived in Memphis, he was advised of his *Miranda* rights and signed a waiver of rights form. The defendant made a statement to Memphis police which was transcribed, then signed by the defendant. In his statement, the defendant admitted that he shot the victim multiple times in the head with the victim's gun. The defendant said that after drinking several beers with the victim at the victim's house, he shot the victim while he was sitting in his bedroom. The defendant further explained:

> We was riding and we swung by [the victim's] house. He knew that I didn't like guys, he knew I like women, but he . . . [was] trying to get me behind closed doors. When he tried to pull [it] out and tried to suck it, and I pushed him back and told him "No, bro. You doing too much." Then he told me, "I ain't asking nobody for nothing, I make my own money, and you be asking me for money." That's all it took. I was ready to go on and take him under. Prior to that, he had the gun sitting on the dresser . . . , and he let me see it, and I told him, "Let me look at that." He handed it to me and let me look at it. I put [as] many holes as I could put in him.

In his statement, the defendant also noted that he took the victim's keys and cell phone with him when he left the victim's house but threw them away in a field next to a gas station. He mentioned that he was going to take off in the victim's vehicle but he could not get the doors open. He said he made phone calls from the victim's phone to Keeiyona, his brother, Damien, and his cousin, Lamont, before he shot the victim.

Nathan Gathright testified that he worked with the Memphis Police Department as an expert in latent fingerprint examination and identification. According to Mr. Gathright, a fingerprint found on the cardboard beer container matched the defendant's fingerprint at seven points. Mr. Gathright noted that it was widely accepted that a seven point match of a fingerprint constituted a positive identification.

Ronald Goodwin, an investigator with the District Attorney's Office, testified that he was given a three page letter by an inmate in the Shelby County Jail. Bartlett Police Captain David Cupp testified that he had experience in handwriting analysis and was qualified as an expert. Captain Cupp testified that an examination of portions of the printed handwriting contained in the three page letter, compared to known handwriting exemplars from the defendant, established that the defendant wrote the letter. Based on Captain Cupp's testimony, the letter along with the exemplars were entered into evidence as an exhibit. In the letter, the defendant admitted to killing the victim and wanted Keeiyona Hill killed for talking to the police about the crime. The letter indicated that the defendant was the author. The letter also noted the following:

> One night I was with this white boy name David Cooper. [H]e pick me up took me to his house and he had some nice thangs in his house so I thought he had some money. . . . [We] drunk a few beers, he fell asleep . . . I found the pistol. I woke him up and robbed him. I asked him where the money was at, he told me he didn't have any so I hit him six times in the head took his wallet and the little money he had and

a watch and cell phone and I called my bitch Keeiyona on the phone and I told her
I was about to kill this white boy but to keep it real he was already dead. . . .

The defendant did not testify but called Dr. Fred Steinberg, a forensic psychologist, to testify on his behalf. Dr. Steinberg testified that he administered several tests to determine the defendant's intelligence, behavior, and cognitive abilities. Dr. Steinberg noted that the defendant's IQ was 74, which was in the borderline range of intellectual functioning. He also tested poorly on several psychological tests, indicating that he tended to have poor judgment, impulsive behavior, a short attention span, a tendency to favor simple solutions to complex problems, and did not perceive the world in the same way most people perceived it. The defendant read reasonably well. He had an eighth grade reading ability, but his reading comprehension was at the third grade level.

Dr. Steinberg testified that the defendant had suffered head injuries in 1996 and 2002, requiring hospitalization in a rehabilitation center. However, Dr. Steinberg testified that he did not believe the defendant's head injuries contributed to his mental problems. He noted:

> I found him to have, as I said, poor reality testing. There was no evidence of active psychosis at the time I tested him, but he's high risk to relapse under certain circumstances, not only because of his cognitive abilities or lack of, but also, because of his history of psychotic thinking. He's prone to a lot of impulsivity. He's very concrete, and, of course, his intellectual functioning was in the borderline area. These things culminate in poor judgment.

On cross-examination, Dr. Steinberg acknowledged that the defendant had no psychosis, was competent at the time of the crime, and was not committable as a danger to himself or others. When shown the three page letter, Dr. Steinberg acknowledged that the language and tone of the letter differed from what the defendant related to him. Specifically, Dr. Steinberg acknowledged that the letter's indication that the defendant decided to rob the victim, then kill him, did not suggest impulsivity. However, Dr. Steinberg suggested that the defendant wrote this letter in jail and probably took a "macho approach" because his circumstances had changed at the time of writing the letter.

Based on the foregoing proof, the jury found the defendant guilty of one count of murder in perpetration of a theft and one count of first degree premeditated murder. The defendant was sentenced to life imprisonment for both convictions. The trial court merged the convictions.

**ANALYSIS**

**I. Sufficiency of the Evidence**

The defendant challenges the sufficiency of the evidence for his convictions for first degree premeditated murder and first degree murder in perpetration of a theft. Specifically, the defendant asserts that there was insufficient proof from which a rational jury could infer that the defendant

formed the requisite intent to commit premeditated murder or formed the intent necessary to deprive the victim of any property. The defendant also submits that his conviction for murder in perpetration of a theft violates his federal and state constitutional rights.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

### A. Premeditated Murder

In challenging his conviction for premeditated murder, the defendant argues that the proof at trial showed he did not intentionally kill the victim, but rather, he killed the victim in self-defense or under strong provocation due to the victim's unwelcome sexual advances toward him.

A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). To be premeditated, the intent to kill must have been formed before the act itself, and the accused must be sufficiently free from excitement and passion. *Id*. An intentional act requires that the person have the desire to engage in the conduct or cause the result. *Id*. § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). In particular, the use of a deadly weapon upon an unarmed victim and declarations by the defendant of an intent to kill are factors which support a finding of premeditation. *See Bland*, 958 S.W.2d at 660.

Viewing the evidence in the light most favorable to the state, the proof established that the defendant was upset because the victim made unwanted sexual advances toward him. The proof also established that the defendant decided he wanted to rob the victim. At some point in the evening, the defendant pretended to fall asleep and the victim went to his bedroom and fell asleep. The

defendant took the victim's gun, woke the victim up, demanded money from him, and shot him multiple times in the face and head. The evidence further shows that the defendant called his girlfriend from the victim's cell phone and bragged about his intent to kill the victim. Accordingly, we conclude that a rational jury could find beyond a reasonable doubt that the defendant exercised reflection and judgment prior to killing the victim, and thus, the killing was intentional and premeditated. *See* Tenn. Code Ann. § 39-13-202(a), (d). The issue is without merit.

## B. Murder in Perpetration of a Theft

In challenging his conviction for murder in perpetration of a theft, the defendant argues that there was insufficient proof of his intent to commit the underlying felony, which in this case was theft.

As applicable to this issue, first degree murder is a "killing of another committed in the perpetration of or attempt to perpetrate any . . . theft." Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts . . . ." *Id*. § 39-13-202(b). The killing must occur in the perpetration of the enumerated offense. *See State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000) (citations omitted). The killing may precede, coincide with, or follow the offense and still be in the perpetration of the offense, so long as there is a connection in time, place, and continuity of action. *See State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999). In the instant case, the enumerated offense is theft. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id*. § 39-14-103. Proof of the intention to commit the underlying offense and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *See Buggs*, 995 S.W.2d at 107. The guilt of the defendant as well as any fact required to be proved may be established by direct evidence, by circumstantial evidence, or by a combination thereof. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Taken in the light most favorable to the state, the proof established that the defendant went to the victim's house and observed that the victim had some nice belongings. The defendant and the victim drank some beers and the victim fell asleep. The defendant found the victim's gun, woke the victim up and demanded money. The defendant hit the victim in the head, and at some point, shot the victim multiple times in the face. The defendant took the victim's wallet, watch, and cell phone. The defendant called his girlfriend and told her he wanted to kill the victim and steal his vehicle. The defendant attempted to take the victim's vehicle, but he could not figure out how to open the doors. The victim's wallet was eventually recovered from a field several streets from the victim's home. Accordingly, we conclude that the jury could find beyond a reasonable doubt that the defendant intended to deprive the victim of property and his conduct in killing the victim was done in perpetration of the theft. The issue is without merit.

## C. Constitutionality of Murder in Perpetration of a Misdemeanor Theft

Without citation to prevailing legal authority, the defendant contends that his conviction of first degree murder in the perpetration of a theft violates his "federal and state constitutional rights to due process, equal protection and . . . constitutional protection against cruel and unusual punishment." The defendant submits that the underlying offense for which he was convicted was a misdemeanor theft (less than $500) and not a felony theft (over $500). He asserts that a misdemeanor theft is not an inherently dangerous offense; and therefore, a conviction of first degree murder based on a misdemeanor theft violates his constitutional rights. The defendant acknowledges that he failed to preserve the issue in his motion for new trial but requests that we review the issue for plain error. In rebuttal, the state submits that the defendant's argument is illogical on the basis that "its very application would raise equal protection issues, since a difference of one cent -- which would separate felony theft from misdemeanor theft -- would permit otherwise similarly-situated defendants to avoid prosecution for the more serious crime of murder in the perpetration of a theft."

At the onset of our review, we note that this court in *State v. Collier V. Harris* has previously analyzed whether a conviction for first degree murder in the perpetration of a theft is unconstitutional. No. 02C01-9603-CR-00095, 1997 WL 746021 (Tenn. Crim. App., at Jackson, Dec. 3, 1997) *affirmed after remand*, *State v. Collier V. Harris*, No. W1999-02144-CCA-RM-CD, 1999 WL 1532323 (Tenn. Crim. App., at Jackson, Dec. 29, 1999), *perm. app. denied* (Tenn. 2000). In *Harris*, this court discussed the issue as follows:

> Defendant argues that the extension of the "felony" murder rule to his conviction of first degree murder in the perpetration of misdemeanor theft violates the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution. Our Supreme Court recently upheld the constitutionality of this statute. *State v. Walker*, 893 S.W.2d 429 (Tenn. 1995). While Defendant challenges the issue on a slightly different basis due to his conviction of first degree murder in the perpetration of a misdemeanor theft, the result is the same. The legislative intent of the statute is to be ascertained from the natural and ordinary meaning of the language used. *Carson Creek Vacation Resorts, Inc. v. State*, 865 S.W.2d 1, 2 (Tenn. 1993); *National Gas Distributors, Inc. v. State*, 804 S.W.2d 66 (Tenn. 1991). The language of the statute is such that first degree murder is "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any . . . theft . . ." Tenn. Code Ann. § 39-13-202(a)(2). Defendant asserts that because the amount stolen was only thirty dollars ($30.00), the theft cannot result in a felony murder conviction. The clear and plain meaning of the language in the statute is that a reckless killing committed in the perpetration of any theft is considered first degree murder, regardless of the monetary value of the property which is the subject of the theft. While the term "felony murder" has long been a term used to describe the statute in question, we note that the term "felony murder" does not appear in the current version of the Code. *See* Tenn. Code Ann. § 39-13-202. . . . .

*Harris*, 1997 WL 746021, at *9.

Plain error review extends only to an obvious error which affects the substantial rights of the defendant. The criteria for finding plain error are difficult to satisfy. We will not recognize plain error unless the following five factors are established: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established, and consideration of all five factors is unnecessary if any one factor indicates that relief is not warranted. *Id.* at 283. The defendant has the burden of persuasion regarding plain error claims. *See United States v. Olano*, 507 U.S. 725, 734 (1993).

Given our previous determination of this issue in *Harris*, it is our view that the defendant has not carried his burden of demonstrating plain error. Specifically, we note that the defendant has not shown that a clear and unequivocal rule of law was breached, or that a substantial right of the defendant was adversely affected. We would also point out that it is the unlawful killing in perpetration of the theft and not an increase in monetary value that makes this offense "inherently dangerous" and requires appropriate punishment in relation to its seriousness. Accordingly, the issue is without merit.

## II. Thirteenth Juror

The defendant contends that the trial court failed to appropriately exercise its role as thirteenth juror and requests a new trial.

Rule 33 of the Tennessee Rules of Criminal Procedure imposes a duty on the trial court to serve as the thirteenth juror in every criminal case. *See State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). If the trial court disagrees with the jury about the weight of the evidence, Rule 33 authorizes the trial court to grant a new trial. Tenn. R. Crim. P. 33(d). The trial court is not required to make an explicit statement on the record, but instead, when the trial court simply overrules a motion for new trial, this court may presume that the trial court has served as the thirteenth juror and approved the jury's verdict. *State v. Moats*, 906 S.W.2d 431, 434 (Tenn. 1995). Only if the record contains statements by the trial court indicating disagreement or dissatisfaction with the jury's verdict or evidencing the trial court's refusal to act as the thirteenth juror may the reviewing court reverse the trial court's judgment. *Carter*, 896 S.W.2d at 122.

At the conclusion of the hearing on the motion for new trial, the trial court overruled the defendant's motion for new trial. In doing so, the court made the following remarks:

> The Court has reviewed the Motion for New Trial. I heard your arguments respectively and believe that there was sufficient evidence to convict the defendant . . . . That the judge, as thirteenth juror, should not have found anything different than what the jury found. That there was no reason for the judge in this particular

case to act as a thirteenth juror because the jur[y] came back with a unanimous verdict. That the motion for Judgment of Acquittal was properly denied by this Court.

Contrary to the defendant's contention, we find nothing in the trial court's statements to indicate that the court was not satisfied with the verdict or that it disagreed with the jury about the weight of the evidence. Accordingly, there was no violation of Rule 33(d), and the defendant is not entitled to relief on this issue.

### III. Motion to Suppress

The defendant challenges the admissibility of his statement to police. Specifically, the defendant argues that the trial court erred in denying the motion to suppress his statement to police because his statement was not knowingly and voluntarily given. The defendant asserts that his intellectual and mental deficiencies precluded a valid waiver of his *Miranda* rights and the police coerced him into giving a statement.

At the suppression hearing, Marvin Fraction, a police officer in Marianna, Arkansas, testified that he knew the defendant. After learning that the Memphis Police Department had issued an arrest warrant for the defendant, Officer Fraction contacted the defendant's relatives and asked them to have the defendant contact him. Shortly thereafter, the defendant came to the police station. The defendant denied any involvement in the murder of the victim, David Cooper. Officer Fraction recalled that he placed the defendant under arrest and advised the defendant of his *Miranda* rights. At the time, the defendant appeared to be calm and was acting normal.

Mark Miller, a police officer with the Memphis Police Department, testified that he and another officer transported the defendant back to Memphis after the defendant waived extradition. Officer Miller recalled that the defendant and the other police officer talked sporadically about various topics during the trip back to Memphis. Officer Miller recounted that the defendant was calm and cooperative and did not appear to be deficient in any way.

Sergeant John Oliver of the Memphis Police Department testified that when the defendant arrived at the police station he advised the defendant of his *Miranda* rights. Officer Oliver recalled that he also asked the defendant to read the advice of rights form out loud and the defendant did so without any difficulty. Officer Oliver further noted that the defendant signed and dated the advice of rights form. Thereafter, Officer Oliver and another police officer interviewed the defendant in a large room regarding the homicide of the victim, David Cooper. According to Officer Oliver, the defendant acknowledged that he knew the victim and had been at his home but said he left and did not know anything about the victim's death. However, the defendant changed his story after being confronted with phone records which showed several calls were made from the victim's phone to friends of the defendant. The victim then confessed that he shot the victim because the victim had made unwanted sexual advances towards him.

Officer Oliver recounted that the atmosphere during the interview was relaxed and informal. Officer Oliver noted that the defendant was given food ordered from Wendy's and was allowed to use the bathroom and get water whenever he asked. The defendant was made comfortable and at no time was the defendant threatened or coerced prior to giving a formal statement. Officer Oliver said that the defendant was advised once again of his *Miranda* rights prior to giving a formal statement which was transcribed by a typist. Once transcribed, the defendant read the statement and made one change, adding his address in Arkansas. The defendant then signed the statement. According to Officer Oliver, the defendant never gave any indication that he did not understand his *Miranda* rights.

Dr. Fred Steinberg testified that an examination of the defendant's high school education records and a battery of neuropsychological tests indicated that the defendant had an IQ of 74, which was in the borderline range of intelligence. The tests also revealed that the defendant read at the seventh grade level but his reading comprehension was at the third grade level. Relying on a computer analysis of the text of the *Miranda* warnings, Dr. Steinberg opined that an understanding of the *Miranda* warnings required someone with a fourth grade reading comprehension level. However, Dr. Steinberg acknowledged that the computer analysis was susceptible to a margin of error. Dr. Steinberg opined that the defendant had a tendency to solve complex problems with simple solutions, which often resulted in poor judgment.

After hearing the foregoing evidence, the trial court ruled that the statement was given voluntarily and was not taken in violation of the defendant's *Miranda* rights. The court stated the following in pertinent part:

> Here, the facts reveal that the Defendant, without any prompting from the police, voluntarily arrived at the Marianna Arkansas Police station after he learned he was wanted for questioning. The Defendant was apprised of his rights at every juncture including after he was arrested, prior to the pre-statement interview with Sergeant Oliver and Sergeant Sims, and again before the formal statement was made. The Defendant had the rights form read aloud to him, the defendant read the rights form aloud to the officers and finally, the Defendant read the rights form quietly to himself. The Defendant made no attempt to ask questions about the rights form nor did he ask for a lawyer. All three officers who came into contact with the Defendant testified that he appeared normal and was coherent and responsive to questioning. When the Defendant was given the opportunity to look over his formal statement for any needed corrections, he added his address and placed his initials by it. And although the heart of the Defendant's argument seems to be that his waiver of rights was not voluntary and knowing due to possible cognitive dysfunction caused by injuries to his head, the expert he proffered agreed with the State's attorney when he argued that any problems the Defendant may have had were not caused by a head injury. In fact, the expert never testified that he found any evidence of a degenerative brain disorder but rather testified that the Defendant had a low IQ score and his reading level was at the seventh grade level whereas his comprehension was at a third

grade level. According to the expert, the *Miranda* warning which the Defendant signed is at the fourth grade level, which is not significantly higher than the Defendant's reading comprehension level and actually lower than his reading level. . . .

. . . .

. . . The record is free of any suggestion other than an assertion by the Defendant in his Motion to Suppress Statements that police resorted to physical or psychological pressure to elicit the statements from him. To bolster his allegation of coercion, the only thing the Defendant points to is the fact that he was taken to a "small room" and "enclosed with various officers." In reality, the Defendant was taken to a standard interview room in the homicide office where he was interviewed by two officers . . . .

It is undisputed that the Defendant was adequately apprised of his *Miranda* rights before the interview by having them read to him and he himself reading them aloud to the officers. During the interview, the Defendant was offered a meal, allowed water, allowed to use the restroom when asked, and never requested to use the telephone nor stop the interview. Furthermore, before the Defendant's formal statement was taken, he was again re-advised of his rights and taken to a cubicle in an open area in the main office of the homicide bureau to give the statement. . . . Lastly, from the time the Defendant arrived at the homicide office until the statement was signed, only four hours had passed. These facts hardly mirror the situations where the court has found over overreaching measures by the police. . . .

(Internal footnotes and citations to authority omitted).

When reviewing the trial court's ruling on a motion to suppress, the court's findings of fact are presumed correct unless the evidence contained in the record preponderates against them. *See State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, appellate review of a trial court's conclusions of law and application of law to facts on a motion to suppress evidence is a de novo review. *See State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

Both the United States and Tennessee Constitutions protect the accused from compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. As a result, police officers are prohibited from using statements made by the accused during custodial interrogation unless the

accused has been previously advised of his or her constitutional right to remain silent and right to an attorney, and the accused knowingly, voluntarily and intelligently waives those rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether waiver of a right is voluntarily, knowingly, and intelligently made is determined by the totality of the circumstances under which the right was waived. *See State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992).

"A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citations and internal quotations omitted). "The primary consideration in determining the admissibility of the evidence is whether the confession is an act of free will." *State v. Berry*, 141 S.W.3d 549, 577-78 (Tenn. 2004). A confession is not voluntary when "the behavior of the state's law enforcement officials was such as to overbear" the will of an accused and "bring about confessions not freely self-determined." *Id*. (citing *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980)). In determining whether a defendant validly waived his rights, the court must consider the following factors: (1) the defendant's age, education or intelligence level, or previous experience with the judicial system; (2) the repeated and prolonged nature of the interrogation, including the length of detention prior to the confession; (3) the lack of any advice regarding his constitutional rights; (4) the unnecessary delay in bringing the defendant before a magistrate prior to the confession; (5) the defendant's intoxication and ill health at the time the confession was made; (6) the deprivation of food, sleep or medical attention; (7) any physical abuse or threats made to the defendant. *See State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996); *State v. Readus*, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988).

In the instant case, the trial court found that while the defendant had a low IQ, the defendant's eighth grade reading level and third grade reading comprehension level allowed him to read and understand the *Miranda* warnings given. The court found that the defendant was coherent and responsive to police questioning. The court also found that the defendant exhibited intelligence and comprehension of his statement by reading over his formal statement and adding his address and initialing the change. In addition, the record establishes that various police officers repeatedly informed the defendant of his *Miranda* rights, that a waiver of rights was memorialized in writing, and that the defendant read the waiver of rights form aloud and to himself. The record further shows that the defendant had the ability for analytical thought as he changed his story when confronted with the victim's phone records and attempted to cast himself as the victim of unwanted sexual advances. It is clear that the trial court took into consideration the defendant's mental state, education, and intelligence in finding that the defendant's statement was knowing and voluntary. The court also found that the police officers used no coercive tactics when interrogating the defendant. The evidence in the record does not preponderate against the trial court's findings that the defendant was advised of his *Miranda* rights, that he knowingly waived those rights, and that he voluntarily gave a statement. Therefore, the defendant's statement was properly admitted and he is not entitled to relief on this issue.

### IV. Admission of Expert Testimony

The defendant contends that the trial court erred in qualifying David Cupp as an expert in handwriting analysis and Nathan Gathright as an expert in fingerprint analysis. The defendant cites *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997), and asserts that Cupp and Gathright were not properly qualified as experts because their work had not been tested, their respective research was insufficient, their opinions had not been subject to peer-reviewed studies or publication, and their research disclosed no potential rate of error.

The decision to admit expert testimony is within the discretion of the trial court and will not be disturbed absent an abuse of discretion. *See Coe v. State*, 17 S.W.3d 193, 226-27 (Tenn. 2000); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). "The abuse of discretion standard contemplates that before reversal the record must show that the court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Coley*, 32 S.W.3d 831, 833 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)), *overruled on other grounds by State v. Copeland*, 226 S.W.3d 287 (Tenn. 2007).

Rules 702 and 703 of the Tennessee Rules of Evidence govern the admissibility of expert testimony and serve to screen out expert opinions that are based on untrustworthy facts or that do not substantially assist the trier of fact in determining an issue. *See McDaniel*, 955 S.W.2d at 266. Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

In addition, Tennessee Rule of Evidence 703 requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Several non-definitive factors may be considered by the trial court when evaluating the reliability of the expert's opinion: (1) whether the data and the methodology upon which the expert formulates an opinion has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the community involved in the body of specialized knowledge; and (5) whether the expert's research in the field has been conducted independent of litigation. *McDaniel*, 955 S.W.2d at 265; *see also State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). However, the application of these factors may or may not be necessary depending upon the issue, the expert's expertise, and the subject of the expert's opinion. *Stevens*, 78 S.W.3d at 833. Indeed, the determinative factors are whether the witness is qualified to give an informed opinion on the subject at issue, and whether the reasoning or methodology underlying the expert's opinion is sufficiently reliable. *Id*. at 834. Notably, "the court may make a finding of reliability if the expert's conclusions are sufficiently straightforward and supported by a rational explanation which reasonable [persons] could accept as more correct than not correct." *Id*.

Before rendering an opinion regarding the handwriting results, Cupp testified that in 1999 he had received training in handwriting analysis by the Secret Service Academy. Cupp noted that he had utilized his training on many occasions. He testified that for the last eight years, he had conducted handwriting analysis for the Federal Bureau of Investigation (FBI), the Secret Service, several law enforcement agencies in Tennessee, and several banks and lending institutions. Cupp also testified that he was a member of two professional associations: The National Association of Document Examiners and The National Association of Fraud Specialists. Cupp noted that these associations required twenty hours of credited courses and ongoing practice. Cupp acknowledged that he was unable to become certified by the American Board of Forensic Document Examiners because he lacked a college degree.

Gathright testified that he trained at the FBI Academy in 1976 and worked as a fingerprint examiner since being trained. He also noted that during his career he completed numerous training courses including two advanced fingerprint identification courses in 1990. Gathright testified that he was certified by the state of Tennessee to instruct on latent fingerprint identification. Gathright further noted that he had testified numerous times at trial as an expert in the area of fingerprint examination and identification. According to Gathright, a 2000 FBI study showed that the probability of two fingerprints being the same was one in two hundred billion. However, Gathright did not cite the name of the study nor express the methodology underlying the results of the study.

The trial court found Cupp and Gathright to be experts based upon their professional experience and work in their respective fields and upon the court's understanding that fingerprint identification and handwriting analysis were generally accepted as reliable. The court further noted that the credibility of the experts' testimony and how it applied to the case was ultimately for the jury to decide. "The objective of the trial court's gate-keeping function is to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Brown v. Crown Equipment Corp*., 181 S.W.3d 268, 275 (Tenn. 2005). Accordingly, we discern no abuse of discretion by the trial court in qualifying Cupp and Gathright as experts in their respective fields as nothing in the record demonstrates that the court's decision was rendered "against logic or reasoning."

## V. Admissibility of Evidence

The defendant argues that the trial court erred in admitting a letter purported to have been written by the defendant without a proper showing of chain of custody and without proper authentication of the letter. The state counters, arguing that the letter was properly authenticated. Having reviewed the record on appeal, we agree with the state.

Generally, the admissibility of evidence rests within the discretion of the trial court, and the court's decision to admit evidence will be reversed only upon the showing of abuse of that discretion. *See, e.g., State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993). An abuse of discretion occurs when the trial court applies an

incorrect legal standard or reaches a conclusion that is illogical or unreasonable and causes an injustice to the party complaining. *See, e.g., Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006). Rule 901 of the Tennessee Rules of Evidence states as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." The methods of authentication or identification in Rule 901(b) are various and include but are not limited to: (1) testimony from a witness with knowledge that a matter is what it is claimed, (2) "comparison by the trier of fact or by expert witnesses with specimens which have been authenticated," and (3) "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tenn. R. Evid. 901(b)(1), (3), (4).

Proof of chain of custody is another method of identification or authentication. *See State v. Ferguson*, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987) (stating that tangible evidence may be properly introduced either when identified by a witness or the chain of custody is established). "The purpose of the chain of custody is to 'demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, the state is not required to prove the identity of tangible evidence beyond all possibility of doubt, neither is the state required to exclude every possibility of tampering. *Id*. Rather, "the evidence may be admitted when the circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity." *Id*.; *see also State v. Holloman*, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992).

At trial, Ronald Goodwin, an investigator with the District Attorney's Office, testified that he and Officer Butterick of the Shelby County Sheriff's Department were interviewing an inmate from the local jail as part of an investigation unrelated to the defendant's case. After the interview, Officer Butterick accompanied the inmate back to his cell, at which time, the inmate gave Officer Butterick the letter in question. Officer Butterick caught up with Goodwin at the Sheriff's Office and gave him the letter. Goodwin recalled that he made a photocopy of the letter, then passed the original letter on to someone in the District Attorney's Office where it was sent to the Tennessee Bureau of Investigation for fingerprint testing. While on the stand, Goodwin was shown the letter in question and identified the letter as the letter that had come into his possession.

Thereafter, David Cupp was presented by the state and qualified by the court as an expert in handwriting analysis. Cupp opined that the defendant was the author of the letter in question. Cupp testified that he reached this conclusion after comparing portions of the printed handwriting contained in the letter to known handwriting exemplars from the defendant. Specifically, Cupp noted that the letter in question contained the defendant's printed signature. Cupp compared the similarities of the signature in the letter with the defendant's printed signature on his waiver of rights form, signed statement to police, and two inmate grievance forms filled out and signed by the defendant. Based on Goodwin and Cupp's testimony, the trial court allowed the letter along with the known exemplars to be entered into evidence. The letter begins with the following introduction: "What's up Brother[,] my name is LEON FLANNEL . . . I'm from Marianne Arkansas. I'm

currently in jail in Memphis, Tennessee because of a snitch." The letter refers to the defendant's former girlfriend, Keeiyona Hill, as the snitch. The letter also notes the victim, David Cooper, by name and relates how the author of the letter killed the victim.

As to the defendant's assertion that the state failed to establish chain of custody, we note that proof of chain of custody is required only when the evidence offered is not readily identifiable or is susceptible to alteration and there is reason to believe that it may have been tampered with, substituted, or altered. According to Rule 901, there are many methods for authenticating a document. Nonetheless, we discern no failure by the state in establishing proof of chain of custody. As noted above, Goodwin testified that the original letter was given to him. While on the stand, Goodwin examined the letter in question and confirmed that the letter before him was the same letter he had received. Therefore, Goodwin's testimony reasonably established the identity of the letter and its integrity. The defendant's assertion in this regard is without merit.

We now address the crux of the issue, that is, whether the letter was properly authenticated. The defendant asserts that the letter was not properly authenticated because the exemplars/ specimens used for comparison were not properly authenticated and were too few in number to support Cupp's opinion that the defendant was the author of the letter. Having reviewed the record, we are fully satisfied that the letter was properly authenticated. Rule 901(b)(2) permitted Cupp, an expert witness, to authenticate the letter after comparing its handwritten text to authenticated handwritten specimens from the defendant, as was done in this case. The defendant presents no authority for his assertion that the state must produce a threshold number of known exemplars/specimens before an expert witness can make a valid comparison. The record clearly reflects that the defendant's handwriting specimens contained in the waiver of rights form and statement to police were properly authenticated through the testimony of Sergeant John Oliver, a witness with knowledge. Tenn. R. Evid. 901(b)(2). In addition, it is completely acceptable to obtain handwriting and signature exemplars for comparison from public records and official files, as the state did when it used the defendant's inmate grievance forms. *See id.* 901(b)(7). Moreover, even assuming otherwise, we note that the letter contained specific and distinctive information about the crime as well as personal matters which only the defendant would know. Thus, the contents of the letter provided support for the conclusion that it was written by the defendant as the state claimed. *See id.* 901. Accordingly, the court did not abuse its discretion in admitting the letter because there was sufficient evidence to support the finding that the defendant authored the letter in question.

## IV. Improper Comments and Instruction

The defendant complains that the trial court made improper comments in qualifying an expert witness in the presence of the jury. The defendant suggests that the court's comments diminished the credibility of defense counsel.

Contrary to the defendant's complaint, we find nothing improper in the court's comments. In ruling that a witness qualified as an expert, the court first noted that defense counsel had done an excellent job questioning the witness pursuant to the *McDaniel* factors. The court then noted that

it was relying on a more recent case discussing the application of the *McDaniel* factors. Next, the court found that the witness was an expert pursuant to "case law and . . . Tennessee Rules of Evidence 702 and 703, but the ultimate decision as what [the witness] says and how it applies to the case is ultimately up to the jury." The court then announced:

> You will get a jury instruction from this Court as to how you are to evaluate the opinion of an expert. All I have done at this point is to say that he is qualified as an expert to testify at this trial . . . . I have not given an opinion as to what he's going to testify to, as to how it applies to this case. I'm only saying that he has been tendered and the Court has accepted him as an expert in the area of fingerprint examination.

Moreover, the record establishes that the defendant did not object to the court's comments to the jury or raise this issue in a motion for new trial. Accordingly, the defendant has waived the issue for appellate review and nothing in the record suggests that the defendant is entitled to plain error review. *See* Tenn. R. Crim. P. 36(a), Tenn. R. App. P. 3(e); Tenn. R. App. P. 36.

The defendant also complains that the "manner in which the trial [court] gave the jury instructions for murder in the perpetration of theft and premeditated murder created a situation where a juror might have believed that the [court] was commenting on the strength of the evidence." The defendant submits that the court placed more emphasis on a guilty verdict than a not guilty verdict.

We have reviewed the jury instructions and find that the trial court gave equal emphasis to all possible verdicts, and specifically instructed the jury that if they found that the state had failed to meet its burden of proof on all charges and lesser-included offenses, they were to return a verdict of "not guilty." Nothing in the record indicates that the trial court's instructions caused the jury to infer that the court was in favor of or against the defendant. Furthermore, we note that the defendant has waived his right to raise this issue on appeal because he failed to object to the instruction at trial and failed to raise the issue in a motion for new trial. *See* Tenn. R. App. P. 36(a); Tenn. R. App. P. 3(e). Accordingly, the defendant is not entitled to relief on this issue.

## VII. Cumulative Errors

The defendant contends that the cumulative effect of the errors in this case deprived him of his right to a fair trial and due process. However, we find no merit to this claim in light of our previous determinations.

## CONCLUSION

Based upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

-18-

_____
J.C. McLIN, JUDGE